Ellen Browning **WHITE**, an infant, by Ralph Theodore White, natural guardian and next friend, et al.,

v.

**Cecil D. KAUFMANN et al.**

Civ. A. No. 771.

United States District Court
E. D. Virginia, Alexandria Division.

July 13, 1954.

Paul L. Delaney, Irving Diener, T. Brooke Howard, Henry B. Crockett, Alexandria, Va., and L. Lee Bean, Arlington, Va., for individual plaintiffs.

Armistead L. Boothe, Alexandria, Va., Simon Hirshman and Albert F. Beasley, Washington, D. C., for defendant Kaufmann.

Frank L. Ball, Arlington, Va., and Edmund D. Campbell, Washington, D. C., for Griffith-Consumers Co.

**214**

BRYAN, District Judge.

About 3:45 o'clock on the afternoon of August 27, 1952 a sudden and violent explosion in the boiler room of Abingdon Apartments, an apartment house of 242 living units situated in the city of Alexandria, Virginia, shattered walls, floors and ceilings of the immediate and adjacent structures and caused personal injury and property damage to tenants and other individuals. The accident occurred at a time when the automatic coal stokers under the boilers were being replaced with oil burners. These suits—fourteen in all—followed. In twelve of them tenants are the plaintiffs; they sue the owners of the apartment house together with the contractor engaged to make the conversion. Another action is brought by an electrician struck by flying debris while working on the job. The remaining action is prosecuted by the owners, for themselves and their subrogated insurers, against the contractor for recovery for the loss directly suffered by them and for indemnification for any liability hereafter fastened by law upon them in favor of the tenants and electrician. The contractor counterclaims for the unpaid balance of the agreed price of the conversion.

The court consolidated all of the actions, and by stipulation among themselves all parties waived a jury trial of the question of liability, but reserved the right to a jury to fix the quantum of recovery, should the court find liability. While every party was represented in court, with the privilege and duty to participate whenever he desired, the hearing was predominantly a trial of the case of owners versus contractor on charges and countercharges of proximate, causal negligence. Expedition of the trial and development of findings determinative of each claim were thought to be most readily obtainable in this manner.

The boiler room and its three boilers are a part of the hot water heating system of the Apartments. Incidently and indirectly they provide hot water for domestic use, but they are not high-pressure or power-generating boilers.

For heating purposes the hot water leaves the boilers through an outlet at the top of each boiler, enters a header (simply a horizontal trunk line picking up the hot water from the several boilers) and thence is forced by automatic pumps to the radiators in the living units. In circuit, it is then conducted back to the boilers, re-enters them through a return pipe in the rear and near the bottom of each boiler, is reheated and repeats its rounds. The outlet atop the boiler is subject to a control valve, manually operated and known as the supply valve. Similarly, the return pipe, where it comes into the boiler, is governable by a valve known as the return valve, also adjusted by hand. Seated in the top wall of each boiler is an automatic diaphragm-type safety valve; the weight of its movable part keeps it closed, but whenever the pressure of water or steam within the boiler is sufficient to do so, this part is raised, the water or steam is allowed to escape, the pressure in the boiler is relieved, and the valve closes again. These three valves—the supply, the return and the safety—are the mechanical principals in this controversy.

Of course there are the fresh-water automatic feed valves allowing water to be introduced into the boiler whenever the system needs replenishing; the usual outlets to expansion tanks, and the other customary appurtenances. But they play no part here.

The boilers were the horizontal firetube type (the flame or gases pass through, and water surrounds, the tubes); they stood abreast and a few feet apart. For convenience they are numbered 1 to 3, from left to right. No. 1, it now turns out, exploded. It was considerably smaller than the other two, which were identical. Beneath each boiler prior to the conversion was a coal stoker burner. The change-over to oil had been under way for some four weeks before the explosion. Work was begun at No. 3. No. 2 had nearly been completed. Nothing had been touched upon or around No. 1, but conduits or

pipes leading towards it were being put in place by the electrician on the day of the accident.

The day previous the situation was this. Summertime, the header valves had been closed to prevent circulation of the hot water into the take-off lines and to the living units. On both 2 and 3 the supply valves (at the outlet from boiler to header) had been shut down, as had the return valves (at return intake, near bottom rear of boiler). Fire was under No. 1 but no other. No. 1 alone was kept in operation during the summer for hot water. Its supply and return valves were open, but the travel of its output was shortened by the header valves as they blocked entry into the branch lines and radiator system. Between No. 1 and the header valves was a takeoff which led the water through the domestic hot water tank, where it circulated in coils, heated the tank water, returned and re-entered No. 1 via the return pipe bearing the return valve. Completing the installation on No. 3 and intending to set off that burner the next day, the contractor filled the boiler with water before leaving.

The morning of the day of the accident, Schmitz, the subcontractor who actually was making the installation, arrived with his men at about 7:30 o'clock. Henry Anderson, the janitor for the Apartments and responsible for the operation of the stokers, then came to the boiler room too. The electrician made the final connections and the burner was ignited under No. 3 between 9:30 and 10 o'clock. When the water had gotten to a heating temperature, Schmitz told Anderson "Cut in No. 3" or "Open the valves", the witnesses varying as to the words used. As to No. 1, Anderson says Schmitz also instructed him "to kill it". Schmitz's, and the recollection of the electrician working with him, is that Schmitz's direction to Anderson about No. 1 was to cut the switch or shut off No. 1. Anderson adds that Schmitz further asked him to leave the fire in No. 1 so as to facilitate the recall of No. 1 to

service, should No. 3 burner not function successfully.

In any event here is what Anderson did. He opened the fresh water feeder valves of No. 3, but as the boiler was already filled, probably no water entered. With a ladder provided by the owners for the purpose, he climbed to the top of No. 3, opened the supply valve and immediately afterwards went to the rear of No. 3 and opened its return valve. Thus No. 3 was "put on the line", sending its water to the header, through the domestic tank and back to the boiler. Anderson then cut the switch for No. 1, thereby terminating all electric power to No. 1's stoker. But, unknown to the subcontractor or his men, Anderson also shut off both the supply and return valves of No. 1.

It was now 10 o'clock A. M. No. 1 boiler was sealed—outlet and return barred. Some coal remained in the hopper. Presumably, no more fuel corkscrewed from the hopper into the firebox, as the worm, the means of transmission, ceased to turn when Anderson pulled the electric switch. Dead, too, was the forced draft which played under the fire as the fuel worked into the firebox through the retort, the draft-blower being subject to the same electric switch. However, the retort, a rectangular basket-shaped receptacle, about 12 inches deep, 15 inches wide, extending back 3 or 4 feet and forming a bed in the firebox, contained such fire as had been necessary to maintain hot water for the 242 units during the morning hours. Natural drafts might well have been expected to continue through the crevices or other apertures, the firedoor being open but slightly, to keep the fire alive.

After making these adjustments Anderson left. Schmitz, the subcontractor, remained for another hour to perfect the operation of No. 3. Unaware that No. 1's valves were closed, uninformed on the mechanics of boilers and oblivious to the incipient danger, the electrician stayed with his job, except for his lunch hour at noon, working within

a foot or more of No. 1. He heard only a "muffled rumbling noise" in No. 1. Anderson returned periodically. A few minutes before the explosion they both left the boiler room and were sitting in the yard outside the building when it was blown up.

Beyond peradventure the explosion was the bursting of No. 1. It was torn inside out. After-examination disclosed that its safety valve had utterly failed. It was "frozen" despite the tremendous pressure within the boiler, a pressure probably three times the stated relief point of the valve.

■■ The sole and proximate cause of the explosion, the court finds, was negligence, negligence by law imputable to the owners. No fault can be laid to the contractor, Griffith-Consumers Company, or to its subcontractor, Rudolph Lewis Schmitz, or to his subcontractor-electrician, Howard G. Snyder.

Initial and activating carelessness was Anderson's closing the supply and return valves of No. 1 with the water above 180°F. (the set of the aquastat) and with a live fire in the box. Schmitz may have told him not to rake out the coals, but this direction was made on the premise that the valves were open. It was exclusively Anderson's idea that prompted the valve-closing. With him it was normal procedure. He had been trained to do it; had done it before; and he was furnished with tools for the purpose. Schmitz's words to him, taken as retold by Anderson, conveyed no such instruction. Clearly they sought only a discontinuance of the stoker operation.

Neither Schmitz nor his helpers could see Anderson turn the valves. They were working in a 3-foot pit in front of No. 3. From the floor 3 and 2 were about 11 or 12 feet in height. No. 2 was between Anderson and the others. No. 1, slightly lower and recessed from the fronting of the others, also hid Anderson for he placed his ladder on the far side of it.

For the three boilers there was a common breeching leading the smoke to a single stack. Owners contend that the operation of No. 3. created an up-draft through the stack and thereby a current of air was drawn through the firebox of No. 1, fanning its fire. Operation of 3, with No. 1 sealed, is characterized as negligence. The answer is twofold; first, the effect so ascribed to 3 has not been proved; second, knowledge that No. 1 was sealed, when they started No. 3 burner, is not brought home to Griffith, Schmitz or Snyder.

■ No support can be found for the suggestion that Anderson was Griffith's or Schmitz's servant, borrowed of the owners. Responsible for the hot water supply, his manipulation of the valves and switch was plainly within the ambit of his regular employment. Indeed, he was stoking and husbanding No. 1 throughout the entire period of the conversion. His own testimony dispels any suspicion of control or direction of him by anyone except the owners.

Negligence of the owners is found, too, in the delegation of so great a responsibility to one of Anderson's competence. Employed as a gardener in May, 1951 and later becoming a handyman about the Apartments, he shortly was promoted to janitor. With three men under him, by 1952 he had the duty of operating the heating plant for the whole project, though he was illiterate, without education of any kind and with previous experience consisting only of firing boilers by hand in a tobacco factory. His incapabilities were the subject of repeated complaints by the mechanic regularly employed to repair the heating equipment.

Anderson's ignorance proved critical. It permitted to pass unnoticed an obvious flag of the impending danger, just two hours before the blast. In ascertaining if a sump pump connection was intact, Anderson or the electrician turned on the switch to No. 1 stoker at about 2 o'clock. The stoker did not respond. The electrician then tripped the switch or relay on the stoker and the motor came on for a few seconds, disclosing electricity at the stoker. The immediate cessation of the motor, though current was available, conclusively indicated that

the boiler temperature was equal to or beyond the aquastat's check, notwithstanding the stoker supposedly had been idle for four hours. Even the electrician, untrained in boiler matters, remarked upon this possibility, but it was beyond the comprehension of Anderson.

No. 1's safety valve evidences most sharply the air of carelessness prevailing in the boiler room. When new, the boiler had a rated strength of 30 pounds for water pressure. Yet the safety valve was set for 75 or 80 pounds. Hence, though the safe boiler-pressure should be doubled and more, the valve could not open. The boiler with the valve was installed in 1942, the year the Apartments were built. It may be that this type of valve was then in general use, as argued by the owners. Nevertheless, this valve had long since been considered unprotective, certainly for many years following the owners' acquisition in 1946, and yet no substitution had been made. Likewise, inadequacy in the size of the instant valve—¾ inch—had been known for several years. As a matter of fact, no inspection or testing of the safety valve is proved ever to have been made. "Poor housekeeping" was how the repair mechanic described the boiler maintenance there.

The safety valve deficiency was not compensated by the engineering safety factor of boilers. Perhaps the boiler had prescribed boiler strength—four or five times its rating—giving a resistance of 120 or 150 pounds. Yet pressures in No. 1 mounted to more than 200 pounds, the boiler ruptured throughout, but the valve held fast.

■ Griffith's contract did not contemplate a conditioning or changing of the boilers. Cleaning of them would have entailed only the running of a brush through the fire tubes, accessible by opening the doors of the boiler shell. Valve evaluation was not a step or incident in the conversion. Detailed plans and specifications for the change were prepared by a mechanical engineer at the instance of the owners. The work had to be done in accordance with them, but

they made no reference to safety valves. The engineer himself had never looked at the valves then in use. The job was merely a substitution of oil for coal. The pressure relief valves mentioned in the specifications have reference to valves in the oil flow system and not to those in the boiler. Accommodation of the existing boilers to the new flame was to be accomplished by regulation of the burners, not the boilers. Neither contract nor business custom required assumption by the installant of control and dominion of all the boilers during installation. Indeed, the owners through Anderson physically retained control of No. 1.

In the applications to the City of Alexandria for permits to make the installation, Griffith failed to answer the inquiry as to safety valves on the boilers. From this inquiry and this omission the owners argue that the work of Griffith or its subcontractor included a consideration of the sufficiency of the safety valves. In reply Griffith testified that the safety valve inquiries were to be answered only in original installations and not on conversions. This seems to have been the view of the City, for it approved the permits (they were never delivered) for Nos. 2 and 3 without a response to the inquiry. A permit for No. 1 was never issued or passed upon; but that is immaterial, for no conversion of No. 1 was ever commenced or attempted. Besides, the procurement or non-procurement of permits is a point too remote to be considered as pertinent to the explosion.

■ The owners, their insurers and all other plaintiffs must be denied any recovery of Griffith-Consumers Company. So far as the evidence reveals, Griffith performed its contract to the fullest extent possible. In consequence it should be permitted to recover on its counterclaim in such amount as may hereafter be ascertained as still owing and due thereunder.

The court has no occasion to rule on whether Griffith could delegate its contract obligations to Schmitz in exonera-

tion of itself, whether Schmitz was an independent contractor or an employee of Griffith, the status of Howard Snyder, the electrician, as an employee or subcontractor, and the other interesting questions of law posed by counsel. The determinative issues here are purely factual and their resolution alone is decisive of the liability phase of these actions.

This memorandum is adopted by the court as its findings of fact and conclusions of law. Counsel for Griffith-Consumers Company will draw an interlocutory order dismissing all claims against their client, declaring the liability of Cecil D. Kaufmann and Isabelle G. Kaufmann, owners of the Apartments, to each of the claimants herein for personal or property damage, as the claim may be, establishing the counterclaim of Griffith subject to verification of its amount, and continuing this action for ascertainment of the damages to be allowed the claimants. Before the order is presented for entry, let it be submitted to attorneys for the owners, their insurers, and the remaining plaintiffs for comment as to form.